# EXHIBIT A



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------- x

BRIAN PORTERA,                                                             x

                      Plaintiff,                                 x

                                           x

              -against-                                      x       **FIRST AMENDED**

                                           x       **COMPLAINT**

THE CITY OF NEW YORK, a municipal entity;                                  x

MICHAEL BLOOMBERG, Mayor of the City of New                               x

York; RAYMOND KELLY, New York City  Police                                 x       **JURY TRIAL**

Commissioner; **STEPHEN HAMMERMAN,**                                       x       **DEMANDED**

**Deputy Commissioner for Legal Matters; THOMAS**                          x

**DOEPFNER, Assistant Deputy Commissioner for Legal** x

**Matters, New York City Police Department; NYPD**                        x

**Special Counsel RUBY MARIN-JORDAN;**                                     x

**JOSEPH ESPOSITO, Chief of Department,**                                  x

**New York City Police Department;**                                       x

**THOMAS GRAHAM; Commander, Disorders Control** x

**Unit, New York City Police Department; JOHN J.**                         x

**COLGAN, Assistant Chief and Commanding Officer,**  x

**Pier 57; DERMOT SHEA, New York CityPolice Officer** x

MOISES MARTINEZ, New York CityPolice Officer,                             x

JOHN DOES 1-10, New York CityPolice Officers;                             x

RICHARD ROES 1-10, New York City Police                                   x

 Supervisors and Commanders,                                             x

                                           x

                      Defendants.                                x

------------------------------------------------------------------------- x

## PRELIMINARY STATEMENT

     1.     This is a civil rights action in which plaintiff, BRIAN PORTERA, seeks relief for

defendants' violation, under color of state law, of his rights, privileges and immunities secured

by the Civil Rights Act of 1871, 42 U.S.C. § 1983, the First, Fourth and Fourteenth Amendments

to the United States Constitution, and the Constitution and laws of the State of New York, during

the Republican National Convention in New York City in 2004 ("the RNC").

1

2.    Defendants, THE CITY OF NEW YORK, a municipal entity; MICHAEL BLOOMBERG, Mayor of the City of New York; RAYMOND KELLY, New York City Police Commissioner; **STEPHEN HAMMERMAN, Deputy Commissioner for Legal Matters, New York City Police Department; THOMAS DOEPFNER, Assistant Deputy Commissioner for Legal Matters, New York City Police Department; NYPD Special Counsel RUBY MARIN-JORDAN; JOSEPH ESPOSITO, Chief of the New York Police Department; THOMAS GRAHAM, Commander, Disorder Control Unit, New York City Police Department; JOHN J. COLGAN, Assistant Chief, New York City Police Department; NYPD Captain DERMOT SHEA;** MOISES MARTINEZ, New York City Police Officer; JOHN DOES 1-10, New York City Police Officers; and RICHARD ROES 1-10, New York City Police Supervisors and Commanders, acting individually and in their official capacities, jointly and severally, implemented, enforced, encouraged, sanctioned and/or ratified policies, practices and/or customs to punish **peaceful protest during the RNC by, <u>inter alia</u>, engaging in indiscriminate mass arrests which were unlawful and without probable cause, instituting a system of perjured sworn statements to attempt to justify those unlawful arrests, instituting a system of preventive detention to keep lawful peaceful demonstrators off the streets during the height of the RNC, requiring that all persons arrested in connection with the RNC be fingerprinted notwithstanding the level of offense and the arrestees' possession of valid identification in violation of New York Criminal Procedure Law § 160.10, and subjecting those arrested to intolerable and cruel and inhumane conditions, including denying them access to family members and to legal counsel for an inordinate and unreasonable amount of time and sanctioned and/or ratified policies, practices and/or customs to punish those engaging in, and those merely observing, peaceful protest during the RNC.**

2

3.     Pursuant to defendants' policies, practices, and/or customs, plaintiff, BRIAN PORTERA, was falsely arrested; subjected to excessive force; deprived of liberty and personal property without due process of law; denied adequate medical attention while in custody and otherwise detained in inhumane conditions and for an excessive length of time; and maliciously prosecuted, *inter alia.*

4.     Plaintiff seeks compensatory and punitive damages, declaratory relief, an award of attorneys fees and costs, and such other and further relief as the Court deems proper.

## JURISDICTION

5.     Jurisdiction is conferred upon this Court by 28 U.S.C. § 1331 and 1343 (3) and (4), as this action seeks redress for the violation of plaintiff's constitutional and civil rights.

6.     Plaintiff's claim for declaratory relief is authorized by 28 U.S.C. '§ 2201 and 2202 and Rule 57 of the Federal Rules of Civil Procedure.

7.     Plaintiff further invokes this Court's supplemental jurisdiction, pursuant to 28 U.S.C. § 1367(a), over any and all state constitutional and state law claims that are so related to the claims within the original jurisdiction of this Court that they form part of the same case or controversy.

## VENUE

8.     Venue is proper in the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1391 (b)(2), in that this is the judicial district in which the events giving rise to the claim occurred.

## JURY DEMAND

9.     Plaintiff demands a trial by jury in this action on each and every one of his claims.

## PARTIES

10.     Plaintiff, BRIAN PORTERA, is a citizen and resident of Oregon.

11.     Defendant CITY OF NEW YORK ("the City") is a municipal entity created and authorized under the laws of the State of New York. It is authorized by law to maintain a police department which acts as its agent in the area of law enforcement and for which it is ultimately responsible. The City assumes the risks incidental to the maintenance of a police force and the employment of police officers.

12.     Defendant MICHAEL BLOOMBERG is and was, at all times relevant herein, the Mayor of the City of New York and the chief policy making official for the City and its departments, including the New York City Police Department ("NYPD") and is responsible, in whole and/or in part, for the creation, implementation, promulgation and enforcement of the policies, practices and/or customs complained of herein. He is sued in both his individual and official capacities.

13.     Defendant RAYMOND KELLY is and was at all times relevant herein, the Police Commissioner for the City of New York, and he is responsible, in whole and/or in part, for the creation, implementation, promulgation and enforcement of the policies, practices and /or customs complained of herein. He is sued individually and in his official capacity.

14.     **STEPHEN HAMMERMAN, is and was at all times relevant herein, the Deputy Commissioner for Legal Matters for the New York City Police Department, and he is responsible, in whole and/or in part, for the creation, implementation, promulgation and enforcement of the policies, practices and /or customs complained of herein. He is sued individually and in his official capacity.**

15.     **THOMAS DOEPFNER, is and was at all times relevant herein, Assistant Deputy Commissioner for Legal Matters for the New York City Police Department, and he**

4

is responsible, in whole and/or in part, for the creation, implementation, promulgation and enforcement of the policies, practices and /or customs complained of herein. He is sued individually and in his official capacity.

16.     Defendant RUBY MARIN-JORDAN is, and was at all times relevant herein, Special Counsel to the New York City Police Department, and she is responsible, in whole and/or in part, for the creation, implementation, promulgation and enforcement of the policies, practices and /or customs complained of herein. She is sued individually and in her official capacity.

17.     Defendant JOSEPH ESPOSITO is and was at all times the Chief of Department of the NYPD, and he is responsible, in whole and/or in part, for the creation, implementation, promulgation and enforcement of the policies, practices and /or customs complained of herein. He is sued individually and in his official capacity.

18.     Defendant THOMAS GRAHAM is the Commanding Officer of the Disorder Control Unit of the NYPD and he is responsible, in whole and/or in part, for the creation, implementation, promulgation and enforcement of the policies, practices and/or customs complained of herein. He is sued individually and in his official capacity.

19.     Defendant JOHN J. COLGAN, is a Deputy Chief in the NYPD and was the senior official overseeing the NYPD's operations at Pier 57 and he is responsible, in whole and/or in part, for the creation, implementation, promulgation and enforcement of the policies, practices and/or customs complained of herein. He is sued individually and in his official capacity.

20.     Defendant Command and Supervisory officer Captain DERMOT SHEA is an NYPD Command and Police Officers involved in the arrests of the plaintiffs and all of

the actions and conduct associated therewith, including, *inter alia*, the use of force, the preferring of charges, the approval of charges, the prosecution of the plaintiffs, the abuse of criminal process, the cruel and inhumane conditions to which those arrested were subjected, the excessive and unnecessary detention, and the implementation of the challenged policies and practices in question herein. **He is sued individually and in his official capacities.**

21.    Defendant MOISES MARTINEZ, Shield No. 04953, is, or was at all times relevant to this complaint, a police officer employed by the NYPD. He is sued individually and in his official capacity.

22.    Defendants JOHN DOES 1-10 are, or were at all times relevant to this complaint, police officers employed by the NYPD. They are sued individually and in their official capacity.

23.    Defendants RICHARD ROES 1-10 are, or were at all times relevant to this complaint, commanders and/or supervisors employed by the NYPD. They are sued individually and in their official capacity.

24.    Defendants BLOOMBERG, KELLY, **HAMMERMAN, DOEPFNER, MARIN-JORDAN, ESPOSITO, GRAHAM, COLGAN, SHEA,** MARTINEZ, JOHN DOES 1-10, and RICHARD ROES 1-10;(collectively, "the individual defendants") are employees and/or agents of the City of New York. They include the individuals who directed and/or authorized the interference with, and/or prevention of, the plaintiffs= expression of speech, protest, assembly and association, the use of unreasonable and excessive force, unreasonable arrests and detentions and/or who actually arrested the plaintiffs, all without probable cause, and who implemented the policies, practices and procedures to unreasonably detain the plaintiffs.  are, or at all times

6

relevant to the complaint were, employees, agents, servants, and/or officers of the City of New York and/or the NYPD.

25.    At all times relevant herein, each of the individual defendants acted under color of law in the course and scope of his duties and functions as an agent, employee, servant, and/or officer of the City and/or the NYPD in engaging in the conduct described herein.

26.    At all times relevant herein, the individual defendants have acted for and on behalf of the City and/or the NYPD with the power and authority vested in them as officers, agents, servants, and/or employees of the City and/or the NYPD, and incidental to the lawful pursuit of their duties as officers, agents, servants, and/or employees of the City and/or the NYPD.

27.    At all times relevant herein, the individual defendants violated clearly established constitutional standards under the First, Fourth, and Fourteenth Amendments of which a reasonable police officer and/or public official under his respective circumstances would have known.

## FACTS APPLICABLE TO ALL CLAIMS

28.    In the evening on August 31, 2004, plaintiff, BRIAN PORTERA, was lawfully present in the vicinity of Madison Avenue and 27th Street.

29.    PORTERA was observing and reporting on RNC-related demonstration activity for a Web-based radio outlet.

30.    At or around the aforesaid time and place, members of the NYPD began indiscriminately arresting people present in that vicinity.

31.    At no time did PORTERA violate any law, regulation, or ordinance, or any order of a police officer.

7

32.    Notwithstanding the absence of probable cause or reasonable suspicion to believe plaintiff had committed any crime or offense, PORTERA was pushed to the ground, handcuffed, and placed under arrest by defendant MARTINEZ.

33.    After apprehending plaintiff, defendant MARTINEZ intentionally destroyed the digital camera plaintiff had been carrying by stomping on it.

34.    Additionally, defendant MARTINEZ intentionally kicked away the cellphone plaintiff had been carrying. Plaintiff was never able to retrieve the cellphone.

35.    Plaintiff suffers from Crohn's disease, a serious intestinal disease that required him to have an ileostomy and requires him to drink fluids frequently.

36.    Plaintiff was detained with other arrestees in hot NYPD-operated vehicles for many hours while awaiting to be transported to, and then brought into, Pier 57.

37.    Although plaintiff, and other arrestees acting on his behalf, repeatedly alerted defendant MARTINEZ and other members of the NYPD, including several JOHN DOES and RICHARD ROES, to plaintiff's medical condition and his need for water, these requests were largely ignored or denied.

38.    As a result of being deprived of water, plaintiff became dehydrated and ill and, *inter alia*, vomited on himself and the area surrounding him.

39.    Even after this episode, members of the NYPD, including defendant MARTINEZ and several JOHN DOES and RICHARD ROES, did not bring plaintiff water and delayed bringing plaintiff to a doctor or medic.

40.    Eventually, plaintiff was transported in police custody to the emergency room at St. Vincent's Hospital in Manhattan, where, *inter alia*, he had to be given intravenous fluids.

41.    Prior to plaintiff's being taken to St. Vincents, one of the RICHARD ROE defendants B RICHARD ROE 1, an NYPD supervisor present at Pier 57 B spoke with MARTINEZ and, on information and belief, other RICHARD ROES and JOHN DOES, about plaintiff's situation.  At some point, RICHARD ROE 1 and MARTINEZ became angry with plaintiff because, on information and belief, plaintiff's medical condition presented them with a difficult and potentially embarrassing situation.

42.    Prior to plaintiff's being taken to the emergency room, RICHARD ROE 1 stated, in sum and substance, that plaintiff should be returned to Pier 57 from the hospital and should be the last person to leave Pier 57.

43.    After being treated at St. Vincent's, plaintiff was taken back to Pier 57, where he was held in filthy and inhumane conditions, and without ready access to water, for many hours.

44.    Plaintiff was, in fact, among the last detainees to be removed from Pier 57. Eventually plaintiff was transported to 100 Centre Street, where he was held until his release on the morning of September 2, 2004.

**45.    While in custody, plaintiff was fingerprinted, pursuant to a policy requiring that all persons arrested in connection with the RNC be fingerprinted notwithstanding the level of offense and the arrestees' possession of valid identification in violation of New York Criminal Procedure Law § 160.10.**

46.    Overall, plaintiff was held in custody for approximately 33 hours.

47.    Plaintiff was arraigned and charged with Criminal Possession of a Weapon in the Second Degree, Reckless Endangerment in the Second Degree, Riot in the Second Degree, and Disorderly Conduct.

9

48.     Plaintiff pleaded not guilty to all of the charges, which were false and falsely sworn to by defendant MARTINEZ **pursuant to a system of perjured sworn statements to attempt to justify unlawful arrests,** and were initiated and continued maliciously and without probable cause, and in order to cover up the wrongful conduct of defendant MARTINEZ and other defendants.

49.     On information and belief, defendant MARTINEZ conspired and acted in concert with RICHARD ROE 1, and, on information and belief, other RICHARD ROES and JOHN DOES, to initiate serious and baseless charges against plaintiff.

50.     To defend the charges against him, plaintiff was forced to return to New York from Oregon on multiple occasions, incurring substantial expense. All of the charges were eventually dismissed upon motion of the District Attorney for lack of evidence.

51.     The individual defendants' acts and omissions described above were intentional, wanton, willful and malicious, and were performed with deliberate indifference and/or in reckless disregard of PORTERA's constitutional rights, entitling plaintiff to punitive damages.

52.     Each of the actions complained of herein was part of and pursuant to a policy, custom, and/or practice of the City and/or the NYPD of stifling protest during the RNC by engaging in mass arrests of demonstrators, those perceived to be demonstrators, and those merely in the vicinity of demonstrators, without individualized suspicion or probable cause.

53.     Each of the actions complained of herein was part of and pursuant to a policy, custom, and/or practice of the City and/or the NYPD of stifling protest during the RNC by failing to properly screen, train, supervise, discipline and/or monitor police officers with respect to the rights of demonstrators, those perceived to be demonstrators, and those in the vicinity of demonstrators.

54.    The filthy, unhealthy and dangerous conditions at Pier 57, the inhumane treatment and denial of water and prompt medical attention that plaintiff suffered while in custody, and the excessive length of time plaintiff was held in custody, *inter alia*, were part of and pursuant to a policy, custom, and/or practice of the NYPD and/or the City of stifling protest during the RNC by subjecting to abuse demonstrators, those perceived to be demonstrators, and those in the vicinity of demonstrators, and/or by encouraging, ratifying, sanctioning, and/or acting with deliberate indifference toward threats to the health, safety, and rights of such individuals.

55.    Said policies, customs, and/or practices were created, designed, implemented, enforced, and/or ratified on behalf of the CITY OF NEW YORK and the NYPD by defendants KELLY and BLOOMBERG.

56.    As a direct and proximate result of the foregoing actions, including defendants= wrongful policies, practices, customs and/or usages complained of herein, PORTERA has suffered physical injury, pain, and suffering, mental anguish, embarrassment, humiliation, and emotional distress, deprivation of liberty and property, and loss of income and other expenses.

## FEDERAL CLAIMS

57.    Plaintiff incorporates by reference the allegations set forth in Paragraphs 1 through 48 as if fully set forth herein.

58.    The acts and conduct described above did violate PORTERA's rights

    (a)    not to be deprived of liberty without due process of law;
    (b)    not to be deprived of property without due process of law;
    (c)    to be free from unreasonable search and seizure;
    (d)    not to be subjected to excessive or unreasonable use of force;
    (e)    to be free from false arrest, imprisonment, and unjustified detention;
    (f)    not to be detained in cruel and inhumane conditions
    (g)    not to be detained for an excessive period of time
    (h)    to receive adequate medical care while in police custody
    (i)    to be free from malicious prosecution;

11

(j)     to engage in speech, peaceable assembly, and association

(k)     to be free from conspiracy to violate his federally protected rights

all in violation of the First, Fourth, and Fourteenth Amendments to the United States Constitution and 42 U.S.C. ' 1983.

59.    Defendant CITY OF NEW YORK is liable for the foregoing violations inasmuch as they occurred pursuant to the municipal policies, practices, and/or customs described above, in particular at paragraphs 44-47.

60.    As a result of the acts and conduct of the defendants complained of herein, PORTERA has suffered physical injury, pain, and suffering, mental anguish, embarrassment, humiliation, and emotional distress, deprivation of liberty and property, and loss of income and other expenses.

## STATE CLAIMS

61.    Plaintiff incorporates by reference the allegations set forth in Paragraphs 1 through 52 as if fully set forth herein.

62.    The acts and conduct of the defendants constitute assault and battery, false arrest and imprisonment, malicious prosecution, abuse of process, negligence and gross negligence, negligence in training, hiring, and supervision, and conspiracy, under the laws of the State of New York. These acts and conduct also violated PORTERA's rights under Article I,  6, 8 and 12 of the Constitution of the State of New York.

63.    Defendant CITY OF NEW YORK is liable for the actions of the individual defendants under the doctrine of respondeat superior.

64.    As a result of the acts and conduct of the defendants complained of herein, PORTERA has suffered physical injury, pain, and suffering, mental anguish, embarrassment,

12

humiliation, and emotional distress, deprivation of liberty and property, and loss of income and other expenses.

65.    Plaintiff served a notice of claim upon defendant CITY OF NEW YORK within 90 days of the incident and has otherwise complied with the statutory requirements of the General Municipal Law of the State of New York.  Although more than 30 days have elapsed since service of the notice and since plaintiff's 50-h hearing, this defendant has neglected to adjust or pay such claim.

**WHEREFORE**, plaintiff demands the following relief jointly and severally against all defendants:

(a)  a declaration that defendants violated the federal rights of plaintiff;
(b)  compensatory damages for physical, emotional, and economic injuries suffered by plaintiff by reason of defendants' unlawful and unjustified conduct, in an amount just and reasonable and in conformity with the evidence at trial;
(c)  punitive damages against the individual defendants to the extent allowable by law; attorneys fees;
(e)  the costs and disbursements of this action; and
(f)  such other and further relief as appears just and proper.


Dated:        New York, New York
              August 27, 2007


                              _____/s/_____
                              JONATHAN C. MOORE (JM 6902)
                              RACHEL M. KLEINMAN (RK 2141)
                              99 Park Avenue, Suite 1600
                              New York, New York 10016
                              (212) 353-9587

                              *Attorneys for the Plaintiff*

13

# EXHIBIT

# B

## In The Matter Of:

*Deidre MacNamara  v.*
*The City of New York, et al.*

---

*Stephen L. Hammerman*
*Vol. 1, August 1, 2007*

---

*Greenhouse Reporting, Inc.*
*Computerized Litigation Support*
*363 Seventh Avenue*
*20th Floor*
*New York, NY  10001*
*(212) 279-5108    FAX: (212) 279-5431*

*Original File SH080207.V1, 261 Pages*
*Min-U-Script® File ID: 2112786911*

**Word Index included with this Min-U-Script®**

Page 3

**S.L. Hammerman**

STEPHEN L. H AMMERMAN,

having been first duly sworn by Lisa

Rosenfeld, a Notary Public for the State of

New York, was examined and testified as

follows:

**EXAMINATION BY
MR. MOORE:**

Q: Can you state your name for the
record, please, and spell your last name?

A: Stephen L. Hammerman,
H-a-m-m-e-r-m-a-n.

Q: Mr. Hammerman, my name is Jonathan
Moore, we met just a moment ago.

A: Yes, sir.

Q: I'm an attorney in a case called
MacNamara versus City of New York. And you're
called here today to give testimony in that case
and some other cases as well. Do you understand
that?

A: Yes, I do.

Q: Have you ever sat for a deposition
before?

A: Yes, I have.

Q: On how many occasions?

Page 4

**S.L. Hammerman**

A: One, I think.

Q: What was that, what was that case
about?

A: Somebody — some matter dealing with
the police department. Tom Doepfner can maybe
help me out, it was a brief deposition dealing
with whether or not I had knowledge that there
was a flaw in the system at the police department
regarding the deletion of names of individuals
who mistakenly had warrants out for their arrest.

Q: Were you just a witness in that case
or were you a defendant in that action?

A: I don't recall but I'll ask, if I
might, Mr. Doepfner.

MR. FARRELL: You just have to
testify from your personal knowledge.

A: I don't recall.

Q: When was that deposition given?

A: Sometime last year.

Q: Is that case still pending now?

A: No.

Q: Do you know the name of the case?

A: No, I don't, sir.

Q: How long are you in the position of

Page 5

**S.L. Hammerman**

deputy commissioner for legal matters at NYPD?

A: Three years.

Q: What was the date you began and the
date you ended?

A: It was sometime early in February of
the year '02 and I retired on December 31st, '04.

Q: Just briefly tell me what your job
was prior to February of '02.

A: I was vice chairman of the board of
Merrill Lynch & Company.

Q: How long had you been at Merrill
Lynch?

A: I was there twice, 1978 for one year,
I left to become regional administrator of the
Securities and Exchange Commission, and I went
back in 1981 until my date of retirement.

MR. ROTHMAN: Until what?

THE WITNESS: Until my date of
retirement.

Q: In your career at Merrill Lynch did
you ever serve in a position of general counsel?

A: I was general counsel, I don't recall
how many years I had that title. I had been
general counsel.

Page 6

**S.L. Hammerman**

Q: But the last several years you were
not in the role of general counsel?

A: I had the title but the department
was pretty much run by other people.

Q: Even while you were vice chairman you
retained the title general counsel?

A: I did.

Q: Do you have a law degree?

A: I do.

Q: Where did you get your law degree?

A: 1962.

Q: From where?

A: NYU.

Q: As I understand it, following that
day you served in the U.S. Attorney's Office?

A: I did.

Q: For how long?

A: 1964 to 1968, I recall.

Q: Did you have any legal jobs from '62
to '64?

A: I did. I was an associate at the law
firm of Dewey Ballantine.

Q: Was it after '68 when you first
joined Merrill Lynch?

Stephen L. Hammerman
Vol. 1, August 1, 2007

Case 1:05-cv-09985-RJS-JCF    Document 20-2    Filed 08/27/2007    Page 18 of 35

Deidre MacNamara v
The City of New York, et al
The

Page 59

**S.L. Hammerman**

[2] they were going to perform during the Republican
[3] National Convention?

[4]     **MR. FARRELL:** Objection.

[5]     **A:** Not that I recall.

[6]     **Q:** Did you attend any meetings of
[7] attorneys in the Legal Bureau where issues such
[8] as the rights of demonstrators of the First
[9] Amendment or civil disobedience were discussed?

[10]     **MR. FARRELL:** Objection.

[11]     **A:** I just don't recall, I'm sorry.

[12]     **Q:** Did you yourself receive any training
[13] with respect to duties that you were expected to
[14] perform at demonstrations during the RNC?

[15]     **A:** No, sir.

[16]     **Q:** Did you have any specific assignments
[17] with respect to your duties during the Republican
[18] National Convention?

[19]     **A:** Other than my normal responsibilities
[20] of overseeing the Legal Bureau?

[21]     **Q:** Yes.

[22]     **A:** No, sir.

[23]     **Q:** Were you assigned to be present at
[24] any particular demonstration on any particular
[25] day?

Page 60

**S.L. Hammerman**

[2]     **A:** No, sir.

[3]     **Q:** Were you consulted during the period
[4] of the Republican National Convention by members
[5] of your staff concerning decisions with respect
[6] to whether orders of dispersal or arrest
[7] decisions were made?

[8]     **MR. FARRELL:** Objection.

[9]     **A:** I apologize, did you say was I
[10] consulted?

[11]     **Q:** Yes. Were you consulted by members
[12] of your staff?

[13]     **MR. FARRELL:** Objection.

[14]     **A:** Not that I recall.

[15]     **Q:** Were you consulted by members of the
[16] police department at any particular time during
[17] the RNC about whether a group should be arrested
[18] for whatever reason?

[19]     **MR. FARRELL:** Objection.

[20]     **A:** No, sir.

[21]     **Q:** Did you attend meetings, inter agency
[22] meetings, meetings where members of Secret
[23] Service, FBI, other law enforcement agencies,
[24] other groups, were present meeting with members
[25] of the NYPD to discuss arrest processing?

Page 61

**S.L. Hammerman**

[2]     **A:** No, sir.

[3]     **Q:** Were you made aware of any specific
[4] intelligence concerning any specific threats of
[5] disruption that were expected to occur during the
[6] RNC?

[7]     **MR. FARRELL:** Don't say anything yet.
[8] Objection. I'm asserting the law
[9] enforcement privilege to the extent and as
[10] outlined in our present motion practice.
[11] I will let the witness answer as to
[12] non-privileged intelligence. I'm just
[13] going to consult with the witness to make
[14] sure that he understands the privilege
[15] assertion.

[16]     **MR. MOORE:** Let me just say before
[17] you consult, maybe the witness should step
[18] outside while we have this discussion.

[19]     **THE WITNESS:** You want me to go
[20] outside?

[21]     **MR. MOORE:** Yes, please. No offense.

[22]     (Witness leaves the deposition room)

[23]     **MR. MOORE:** I'm asking him a question
[24] I've asked every witness I've ever done a
[25] deposition of. Were you aware of any

Page 62

**S.L. Hammerman**

[2] specific intelligence about expected
[3] disruptions of the RNC. Nobody's objected
[4] to that question in that form until now.

[5]     **MR. FARRELL:** I wasn't present at —
[6] no deposition that I've defended have you
[7] asked that question.

[8]     **MR. MOORE:** That's not true. That's
[9] not true, Peter. You know, nobody has
[10] tried to distinguish between open source
[11] and some other source of information.
[12] I've asked them what they were made —
[13] what they were aware of in terms of
[14] intelligence and I don't see how you could
[15] now instruct this witness — I suspect his
[16] answer is going to be no anyway.

[17]     **MR. FARRELL:** Two things, one is I
[18] have taken the position at prior
[19] depositions and we have in court papers
[20] that and the information we made available
[21] as you are aware is the open source
[22] information that we've produced. We
[23] produced that in hard documentation. And
[24] we currently have a dispute over
[25] information sought regarding non-open

Page 99

[1] **S.L. Hammerman**

[2] forgive me and perhaps my colleagues then can

[3] fill me in. Were you the person during the RNC

[4] who was responsible for defining the role that

[5] the Legal Bureau would play during the RNC?

[6] **MR. FARRELL:** Objection. Alan, with

[7] all due respect, this was covered in great

[8] detail by Mr. Moore this morning when you

[9] were not present.

[10] **MR. LEVINE:** If he'll give me a yes

[11] or no we'll take it as a predicate

[12] question, and if it goes beyond and

[13] repeats things that Jonathan asked, then

[14] I'll refrain.

[15] **A:** The duties of the lawyers from the

[16] Legal Bureau were primarily overseen by

[17] Commissioner Tom Doepfner.

[18] **Q:** And who made particular assignments

[19] during the RNC, was that Commissioner Doepfner?

[20] **MR. FARRELL:** Objection.

[21] **A:** Yes.

[22] **Q:** Now I have in mind two particular

[23] assignments, one which is my particular concern

[24] that is events that took place at the World Trade

[25] Center on August 31st, 2001, in the afternoon

Page 100

[1] **S.L. Hammerman**

[2] there was a demonstration at that time. Do you

[3] know anything about that demonstration?

[4] **MR. FARRELL:** Objection.

[5] **A:** No, Alan, not that I recall.

[6] **Q:** You don't recall seeing any videos of

[7] that demonstration?

[8] **A:** No, sir.

[9] **Q:** Do you have any recollection of

[10] hearing about it before it took place?

[11] **A:** No recollection.

[12] **Q:** Do I take it from all of that that

[13] you have no idea who, if anybody, from the Legal

[14] Bureau was assigned to that demonstration?

[15] **A:** No, sir, I do not.

[16] **Q:** Have you ever heard the organization

[17] called the War Resisters League?

[18] **A:** I don't recall, sir.

[19] **Q:** So I take it you have no recollection

[20] of their involvement in the RNC demonstration?

[21] **A:** Not that I recall.

[22] **Q:** Now I said I have in mind two

[23] assignments, one you recall nothing about, the

[24] other has to do with Pier 57, who made the

[25] assignments of Legal Bureau personnel to Pier 57?

Page 101

[1] **S.L. Hammerman**

[2] **A:** Commissioner Doepfner.

[3] **Q:** And you had nothing to do with those

[4] assignments?

[5] **MR. FARRELL:** Objection.

[6] **MR. LEVINE:** Withdrawn.

[7] **Q:** Did he discuss those assignments with

[8] you?

[9] **A:** No, sir.

[10] **Q:** Do you know the people who were

[11] assigned to Pier 57 at various times during the

[12] RNC?

[13] **A:** Most of them, yes.

[14] **Q:** Are you able to recall who was there

[15] at given times?

[16] **A:** No, sir.

[17] **Q:** Commissioner Doepfner made the

[18] assignments, is that right?

[19] **A:** It's my understanding people working

[20] for him might have made assignments on his

[21] behalf.

[22] **Q:** Who in the department below

[23] Commissioner Doepfner would have been involved in

[24] making those assignments?

[25] **A:** Alan, I have no idea.

Page 102

[1] **S.L. Hammerman**

[2] **Q:** Can you tell me who was at Pier 57

[3] beginning with the highest ranked personnel. I

[4] guess that's you, for one, you were there at some

[5] times?

[6] **A:** I visited there on or off.

[7] **Q:** Who else do you know who was there?

[8] **A:** You're talking about the Legal Bureau

[9] standpoint, sir?

[10] **Q:** Yes?

[11] **A:** Commissioner Doepfner popped in once

[12] in a while.

[13] **Q:** Beyond the rank of anybody else who

[14] might have been there?

[15] **A:** Let me try to remember who was there.

[16] Ruby Marin was there and that's all I recall

[17] right now.

[18] **Q:** You don't know when Ms. Marin was

[19] there?

[20] **A:** No, sir, I do not.

[21] **Q:** And her position in the department

[22] was what?

[23] **A:** She was a senior attorney for the

[24] department. She's sitting here right now.

[25] That's the young lady over there I'm not allowed

Page 103

**S.L. Hammerman**

[1]
[2] to talk to. I've met her on other occasions or
[3] at least been in the same room with her on other
[4] occasions.
[5]    **Q:** Do you know anything about the
[6] offense of parading without a permit?
[7]    **MR. FARRELL:** Objection.
[8]    **A:** Do I know there is an offense of
[9] parading without a permit, yes.
[10]    **Q:** Let's start with that, the answer to
[11] that is yes?
[12]    **A:** I do know there is such a
[13] prohibition, yes.
[14]    **Q:** Do you know the circumstances under
[15] which it is committed, under which such an
[16] offense is committed?
[17]    **MR. FARRELL:** Objection.
[18]    **A:** No, sir.
[19]    **Q:** Let me put it differently. Do you
[20] know when people are walking on the streets or
[21] sidewalks are required to get a parade permit?
[22]    **MR. FARRELL:** Objection.
[23]    **A:** I couldn't give you the details, I
[24] just don't know.
[25]    **Q:** Were you involved in any discussions

Page 104

**S.L. Hammerman**

[1]
[2] during the RNC about persons charged with the
[3] offense of parading without a permit?
[4]    **A:** No, sir.
[5]    **Q:** Would you give the same answer to the
[6] same question about disorderly conduct?
[7]    **MR. FARRELL:** Objection.
[8]    **A:** Not that I recall.
[9]    **MR. LEVINE:** Off the record for a
[10] moment.
[11]    (Discussion off the record)
[12]    **Q:** Just a couple of more questions. Who
[13] were your direct reports within the department?
[14] Commissioner Doepfner for one, right?
[15]    **A:** Yes, Commissioner Doepfner,
[16] Commissioner Debbie Zoland, Z-o-l-a-n-d.
[17]    **MR. ROTHMAN:** What's the first name?
[18]    **THE WITNESS:** Debbie.
[19]    **Q:** Is it Deborah?
[20]    **A:** I don't know.
[21]    **Q:** Debbie i-e, Zoland?
[22]    **A:** Z-o-l-a-n-d. One was Commissioner
[23] Susan Petito, Petito, and director Tom Prasso,
[24] P-r-a-s-s-o.
[25]    **Q:** Also a commissioner?

Page 105

**S.L. Hammerman**

[1]
[2]    **A:** No, he's director of a licensing
[3] bureau, the Gun Licensing Bureau.
[4]    **Q:** Which, if any, of them, and maybe
[5] you've already told us, was most directly
[6] involved with Legal Bureau work during the RNC,
[7] was that Commissioner Doepfner?
[8]    **A:** Yes, sir.
[9]    **Q:** And do you know who his direct
[10] reports are?
[11]    **A:** I'll try and give you some of them.
[12] Captain Sweet, S-w-e-e-t. There were several, I
[13] apologize, I just don't remember the names.
[14]    **Q:** Let me focus a bit more to the events
[15] with which we're really concerned. Do you know
[16] which of his direct reports was most activity
[17] involved in events around the RNC?
[18]    **MR. FARRELL:** Objection.
[19]    **A:** Most actively involved, no, my only
[20] embarrassment is not remembering the names. So
[21] whoever his direct reports were had an
[22] involvement. Most direct — I think Commissioner
[23] Doepfner, I don't know the answer to that.
[24]    **Q:** So is it fair — with regard to
[25] Commissioner Doepfner, he's the person who on a

Page 106

**S.L. Hammerman**

[1]
[2] day-to-day basis supervised the work of Legal
[3] Bureau during the RNC, is that correct?
[4]    **MR. FARRELL:** Objection.
[5]    **A:** In that phase — yes, for the RNC,
[6] yes. There were other legal activities going on
[7] unrelated to the Republican National Convention.
[8]    **Q:** Do you know if he held daily meetings
[9] with his subordinates during the RNC?
[10]    **A:** No.
[11]    **Q:** But you did not?
[12]    **A:** No, I did not.
[13]    **Q:** Is it fair to say that with regard to
[14] the operations of the Legal Bureau during the
[15] RNC, you delegated your authority to Commissioner
[16] Doepfner?
[17]    **MR. FARRELL:** Objection.
[18]    **A:** Yes.
[19]    **Q:** I've enjoyed this but that's not a
[20] good reason to continue, thank you.
[21]    (Lunch recess: 1:07 p.m.)
[22]
[23]
[24]
[25]

# EXHIBIT

# C

Cai Deposition

Page 86

1      T. Cai - Unproofread Transcript
2    squad, correct?
3        A.    I assume so.
4        Q.    Do you know what he was doing on
5    the scene?
6        A.    No.
7        Q.    Do you remember if he was making
8    any dispersal orders?
9        A.    No.
10       Q.    Do you remember if he told
11   anybody to move backward?
12       A.    No.
13       Q.    Turning back to your entry for
14   2100, it says that -- did anybody tell you to
15   make this entry at Pier 57 when you were at
16   the pier?
17       A.    Yes.
18       Q.    Who told you to make this?
19       A.    By the legal service, legal
20   bureau.
21       Q.    Did they tell you why wanted you
22   to make an entry in your memo book?
23             MR. WEILER: Objection. I'm not
24       going to let the witness answer.
25       That's attorney-client privileged

Page 87

1      T. Cai - Unproofread Transcript
2         conversation.
3        Q.    You say that -- do you remember
4    the individual from the legal bureau who you
5    spoke to?
6        A.    Yes.
7        Q.    Who was that?
8        A.    I don't know his name.
9        Q.    Do you know his rank?
10       A.    Lieutenant, I believe lieutenant.
11       Q.    Was he dressed in uniform?
12       A.    No; in business attire.
13       Q.    Business suit?
14       A.    A shirt and business pants.
15       Q.    Was that like a polo shirt --
16       A.    Polo shirt.
17       Q.    -- like I'm wearing with a loose
18   collar and a few buttons by the neck?
19       A.    I don't remember the details.
20       Q.    Okay. How did you know he was a
21   lieutenant?
22       A.    Because I've seen him before.
23       Q.    Where had you seen him before?
24       A.    In previous demonstrations.
25       Q.    Was he present on the scene at

Page 88

1      T. Cai - Unproofread Transcript
2    35th Street?
3        A.    No.
4        Q.    Did you see anybody from the
5    legal bureau present on 35th Street?
6        A.    Not to my knowledge.
7        Q.    Was he a thin man?
8        A.    He's a little bald-headed, white,
9    approximately early 50s, about 160 pounds,
10   5 feet 7. That's about it.
11       Q.    And you just came up with the
12   description from memory?
13       A.    Yes.
14       Q.    If I told you the name Daniel
15   Albano, would that ring a bell to you?
16       A.    No.
17       Q.    Did the legal bureau instruct you
18   to write down anything on any other paperwork
19   other than this entry that they instructed you
20   to make in your memo book?
21       A.    Yes.
22       Q.    What other --
23       A.    The online booking sheet.
24       Q.    Did the legal bureau give you the
25   words that you should use to write in your

Page 89

1      T. Cai - Unproofread Transcript
2    memo book?
3        A.    Yes.
4        Q.    Did the legal bureau give you the
5    words you should write on your online booking
6    sheet?
7        A.    Yes.
8        Q.    When it says here that these
9    people marched with over 100 others on the
10   sidewalk and forced pedestrians into the
11   street, where were the pedestrians forced into
12   the street on the diagram that you wrote here?
13       A.    Pedestrians, I didn't see any.
14       Q.    You didn't see what?
15       A.    Pedestrians. Any pedestrians.
16       Q.    Did you see any pedestrians at
17   any point forced from the sidewalk onto the
18   street?
19       A.    No.
20       Q.    In your memo book entry here for
21   2100 hours it says that these five individuals
22   marched with 100 others on the sidewalk
23   forcing pedestrians into the street.
24       A.    If it would have been pedestrians
25   on the sidewalk, there's no way for them to

23 (Pages 86 to 89)

Page 90

1 T. Cai - Unproofread Transcript
2 cross, to walk to the sidewalk.
3     Q.    Did you see any pedestrians ever
4 forced onto the street?
5     A.    I couldn't tell. It would have
6 been pedestrians and, you know --
7     Q.    You couldn't tell?
8     A.    I couldn't tell.
9     Q.    And here it says that the order
10 to disperse was given by Captain Bologna, it
11 says in the memo book, right?
12     A.    Yes.
13     Q.    You said earlier that you did not
14 hear Captain Bologna give any orders to
15 disperse, correct?
16     A.    Yes.
17     Q.    Why does it say in your memo book
18 that the order was given by Captain Bologna?
19     A.    We were told by them, the legal
20 service, the legal bureau.
21         MR. WEILER: Jeff, can we take a
22 short break, a five-minute break?
23         MR. ROTHMAN: Yeah, all right.
24         MR. WEILER: Thanks. I wanted to
25 confer with the witness. You can note

Page 91

1 T. Cai - Unproofread Transcript
2 that for the record, if you'd like, but
3 I just want to take a five-minute
4 break.
5         MR. ROTHMAN: Yes, I will note
6 for the record that you are going to
7 ^ CHECK.
8         (Witness and counsel conferring.)
9         MR. ROTHMAN: We're back on the
10 record.
11 BY MR. ROTHMAN:
12     Q.    We have just taken a little
13 break, and during that break have you
14 consulted with your lawyer?
15     A.    Yes, I have.
16     Q.    Have you consulted with regard to
17 the content of your testimony?
18         MR. WEILER: Objection. You
19 can't -- this is discussions that we
20 had attorney to client. You can't ask
21 what we talked about.
22         MR. ROTHMAN: I didn't ask the
23 specifics. What the contents of his
24 testimony, that I can ask.
25         MR. WEILER: Well, you can ask if

Page 92

1 T. Cai - Unproofread Transcript
2 it generally concerned the deposition
3 today, but nothing about the content of
4 it, which you may not have. I wanted
5 to put that objection --
6         MR. ROTHMAN: I'm not asking
7 whether you discussed the artwork in
8 the conference room, I mean.
9     Q.    Did you discuss the contents of
10 your testimony, did you discuss that which
11 you're testifying about?
12         MR. WEILER: Objection. It's
13 exactly ^ CHECK we talked about matters
14 related to this deposition. But I'm
15 not going to let you ask specifically
16 what we talked about.
17         I'm sure you can surmise that
18 that's what we talked about, but I'm
19 not going to allow him to answer what
20 we talked about.
21         MR. ROTHMAN: I didn't ask the
22 specific areas. I just whether --
23     Q.    Did you consult with your
24 attorney about your deposition testimony?
25     A.    Yes, I did.

Page 93

1 T. Cai - Unproofread Transcript
2     Q.    Was Lieutenant Wolfe present on
3 35th Street?
4     A.    I don't recall.
5     Q.    Do you know -- you don't recall?
6     A.    I don't recall. He could be
7 there, but I --
8     Q.    Do you know if he was in charge
9 of Sergeant Crimmins and your van that day?
10     A.    I don't recall.
11     Q.    Do you know a police chief named
12 Smolka?
13     A.    Yes, I know him.
14     Q.    Bruce Smolka?
15     A.    Bruce Smolka.
16     Q.    Was he there on 35th Street that
17 day?
18     A.    I don't know.
19     Q.    Do you know a sergeant named
20 Donnelly?
21     A.    Yes.
22     Q.    Is he also within the task force?
23     A.    Yes.
24     Q.    Was he present there that day?
25     A.    I don't know.

24 (Pages 90 to 93)

Page 110

1    T. Cai - Unproofread Transcript
2    pepper sprayed them?
3        A.    No.
4        Q.    Did you ever hear Officer Frias
5    make any reference to pepper spray?
6        A.    No.
7        Q.    Did Officer Frias arrive with you
8    to Pier 57?
9        A.    I don't recall.
10       Q.    Do you remember having any
11   conversations at all with any of your
12   arrestees prior to the time when you arrived
13   at Pier 57?
14       A.    No.
15       Q.    When you arrived at Pier 57, what
16   happened, sir?
17       A.    When I arrived and -- okay, when
18   we arrived, I took them out of the prisoners
19   wagon, and they were tables set up at the
20   piers that each prisoner has to go to each
21   table for a total search by NYPD personnels
22   over there, okay, and all the belongings were
23   vouchered by the NYPD personnels at the pier.
24       Q.    And then what happened to the
25   people?

Page 111

1    T. Cai - Unproofread Transcript
2        A.    And then they were taken into the
3    cells, holding cells, at the pier.
4        Q.    Were you involved in vouchering
5    their property?
6        A.    No.
7        Q.    What were you doing while they
8    were having their property vouchered?
9        A.    I was, you can say, supervising,
10   watching. I was watching the whole process.
11       Q.    So were you there when their
12   property was vouchered?
13       A.    Yes.
14       Q.    Did you place them into the cell
15   at Pier 57?
16       A.    No. Later. The corrections did.
17       Q.    Corrections?
18       A.    Corrections.
19       Q.    Not NYPD, but Department of
20   Corrections personnel?
21       A.    Yes.
22       Q.    How do you know they were
23   Department of Corrections personnel?
24       A.    Different patches.
25       Q.    What kind of cells were the

Page 112

1    T. Cai - Unproofread Transcript
2    people put into at the pier?
3        A.    Could you clarify that, what do
4    you mean?
5        Q.    Were they cells, were they cages,
6    were they made out of fencing?
7        A.    They were cages.
8        Q.    And they were made out of
9    fencing?
10       A.    Fencing, yeah.
11       Q.    Did they have any barbed wire at
12   the top?
13       A.    I don't recall that.
14       Q.    When did you have your
15   conversation with the legal bureau?
16       A.    Remember when I told you the
17   tables were set up at the piers?
18       Q.    Yes.
19       A.    One of the tables were the legal
20   bureau.
21       Q.    Did you speak with them after
22   your arrestees were put into the cages?
23       A.    Yes.
24       Q.    And was the first step after your
25   arrestees were placed into the cages to speak

Page 113

1    T. Cai - Unproofread Transcript
2    with the legal bureau?
3        A.    Yes.
4        Q.    What was the purpose of speaking
5    to the legal bureau?
6        A.    So we could be interviewed by the
7    legal bureau, and they will help us to write
8    the narrative more professionally.
9        Q.    To write the narrative --
10       A.    More professionally.
11       Q.    More professionally, okay. Was
12   that the narrative -- on what document?
13       A.    On the online booking sheet and
14   my memo book entry, obviously.
15       Q.    When you went up to speak with
16   them -- withdrawn.
17           Who told you that you should go
18   over and talk to the legal bureau?
19       A.    Because there were tables being
20   set up and we were told by the supervisors at
21   the pier. I don't know his name.
22       Q.    Do you know the names of any
23   supervisors at the pier?
24       A.    No.
25       Q.    Did Sergeant Crimmins come to

29 (Pages 110 to 113)

Page 114

1    T. Cai - Unproofread Transcript
2    Pier 57?
3         A.    Yes, he did.
4         Q.    What was he doing with regard to
5    the processing of the arrestees?
6         A.    Supervising.
7         Q.    Do you remember having
8    conversations with him at the pier?
9         A.    I don't recall.
10        Q.    Do you remember if he also spoke
11   to the legal bureau?
12        A.    I don't recall.
13        Q.    Well, what do you remember him
14   doing at the pier?
15        A.    He was just walking around making
16   sure everything's okay, I guess.
17        Q.    Do you remember any other members
18   from your task force being at the pier?
19        A.    I don't recall.
20        Q.    What's Sergeant Crimmins' first
21   name?
22        A.    Thomas.
23        Q.    When you went to speak to the
24   legal bureau, they gave you the words to put
25   in your memo book and on the online booking

Page 115

1    T. Cai - Unproofread Transcript
2    system worksheet?
3         A.    Yeah.
4         Q.    Did they speak to you first to
5    find out where the arrest had taken place?
6         A.    Yes, they did.
7         Q.    Did they speak to you to find out
8    any other information other than where the
9    arrest had taken place?
10        A.    Yes.
11        Q.    What else did they want to know
12   from you?
13        A.    They basically asked me about
14   what I saw and what was taking place at the
15   particular time and location, and what I did
16   observed.
17        Q.    And after they asked you what you
18   saw and did, they then told you what to write
19   in the narrative portion on the online booking
20   sheet and in your memo book?
21        A.    That's correct.
22        Q.    Is the only individual from the
23   legal bureau you spoke to the lieutenant who
24   you mentioned earlier?
25        A.    Yes.

Page 116

1    T. Cai - Unproofread Transcript
2         Q.    Did they recite to you the words
3    that you would write down, and you wrote it
4    down as they said the words, is that how it
5    went?
6         A.    Yes.
7         Q.    For both your memo book and the
8    online booking system worksheet?
9         A.    Yes.
10        Q.    That was also the same lieutenant
11   from the legal division that you mentioned?
12        A.    Yes.
13        Q.    After that, was there another
14   review by any other supervisors in the NYPD of
15   your arrest paperwork at Pier 57?
16        A.    Yes.
17        Q.    What was the other review?
18        A.    I don't know.
19        Q.    Was it a sergeant?
20        A.    I have no idea.
21        Q.    Do you know if it was from the
22   Criminal Justice Bureau?
23        A.    I don't know because what
24   happened, we were finished our paperwork and
25   we just hand them in for processing.

Page 117

1    T. Cai - Unproofread Transcript
2         Q.    Do you know who you handed it in
3    to?
4         A.    No.
5         Q.    But when you handed it in, there
6    was somebody else who reviewed them?
7         A.    Who reviewed them, yes.
8         Q.    And signed off on them?
9         A.    Yes.
10        Q.    Do you remember who that
11   individual was?
12        A.    No.
13        Q.    Do you remember if it was a man
14   or a woman?
15        A.    I don't recall.
16        Q.    Do you remember if they asked you
17   to make any changes?
18        A.    No.
19        Q.    When you arrested your five
20   arrestees on 35th Street, did you take any of
21   their property at that location or at the
22   paddy wagon and place it into any plastic bags
23   at that location?
24        A.    No.
25        Q.    Did all of their possessions

30 (Pages 114 to 117)

Page 130

1    T. Cai - Unproofread Transcript
2        A.    Yes.
3        Q.    Do you recollect whether
4    Ms. Aikman had one?
5        A.    I don't recall. Everything she
6    had, I vouchered.
7        Q.    Do you know what a bandana is?
8        A.    Yes.
9        Q.    She did not have a bandana?
10       A.    No.
11       Q.    And she did not have a Frisbee?
12       A.    No.
13       Q.    Does this refresh your
14   recollection that this was filled out in your
15   hand and she signed this as to whether or not
16   it's possible that the property vouchering
17   took place after you had placed after
18   Ms. Aikman had been placed into one of the
19   cages and then removed from the cage?
20       A.    No.
21       Q.    It does not refresh your
22   recollection as to that?
23       A.    No.
24       Q.    Does it refresh your recollection
25   as to whether or not you were the officer who

Page 131

1    T. Cai - Unproofread Transcript
2    vouchered her property?
3        A.    Yes, I was, yeah.
4        Q.    You were the officer who
5    vouchered the property?
6        A.    Yes.
7        Q.    You had previously said --
8        A.    I did the voucher, I wrote it
9    down. But they were in charge of all the
10   booking and all the procedures. I just wrote
11   down whatever she had and she signed. That
12   was it.
13       Q.    Okay.
14             (Cai Exhibit 5, five online
15       booking system arrest worksheets,
16       marked for identification, as of this
17       date.)
18       Q.    Sergeant, I'm showing you what
19   has been marked as Cai 5. Are these the five
20   online booking system arrest worksheets that
21   you filled out for the five people who you
22   arrested on August 31st, 2005?
23       A.    Yes. It is my handwriting.
24       Q.    The first of these is for
25   Christina Aikman, correct?

Page 132

1    T. Cai - Unproofread Transcript
2        A.    Yes.
3        Q.    This narrative section was filled
4    in after this was dictated to you by the
5    NYPD's legal bureau, correct?
6        A.    Yes.
7        Q.    Now, the charges above that, did
8    they also tell you what to write in there?
9        A.    They told me to add a parading
10   without a permit to it.
11       Q.    But they otherwise told you that
12   the disorderly conduct subsections 5 and 6 are
13   both appropriate?
14       A.    Yes, because I personally had
15   told them that basically what they were doing,
16   and they said charge them with disorderly
17   conduct 6 and 6.
18       Q.    Can you read me, please, what it
19   says in the narrative section?
20       A.    At TPO defendant, alone with over
21   100 others, marched on the sidewalk forced
22   pedestrians into the street and refused to
23   comply with lawful order to disperse.
24       Q.    Is that the same narrative that
25   you have on the next page on the online

Page 133

1    T. Cai - Unproofread Transcript
2    booking system arrest worksheet for David
3    Siegel?
4        A.    Yes. They're all identical.
5        Q.    Is that the same that you have
6    for Tyson Pincher on the third online booking
7    system arrest worksheet?
8        A.    Yes.
9        Q.    Is that the same that you have on
10   the fourth for Kyla Hershey Wilson?
11       A.    Yes.
12       Q.    The fifth for Heather Cousins is
13   somewhat different in that you started to
14   write something on the last line and then
15   struck it out, correct?
16       A.    Yes.
17       Q.    What does it look like that you
18   started to write and then struck out?
19       A.    Captain Bologna.
20       Q.    Why did you start to write that
21   they refused to comply with Captain Bologna?
22       A.    I made a mistake.
23       Q.    What would have been the reason
24   why you would have begun to write Captain
25   Bologna's name, if anybody else's name?

34 (Pages 130 to 133)

Page 134

1    T. Cai - Unproofread Transcript
2           MR. WEILER: Objection.
3           You can answer.
4    A.    I thought it wasn't necessary.
5    Q.    You thought what?
6    A.    It wasn't necessary to put
7    down -- put his name down.
8    Q.    Well, did you ever hear --
9    withdrawn.
10          You stated earlier that you never
11   heard Captain Bologna give any orders to
12   disperse.
13   A.    Yes.
14   Q.    And so not only is it not
15   necessary to write, that would be false,
16   correct?
17   A.    No, it wasn't false because I was
18   advised by the legal bureau that Captain
19   Bologna gave -- had gave them the order to
20   disperse. But I didn't hear it personally,
21   but I did give them the order to disperse.
22          So I felt it wasn't necessary to
23   put his name down because I didn't hear it.
24   But he did give the order according to the
25   legal bureau of personnel.

Page 135

1    T. Cai - Unproofread Transcript
2    Q.    Okay. In the course of your
3    duties as a New York City police officer
4    outside of the Republican National Convention,
5    you fill out many of these online booking
6    system arrest worksheets, correct?
7    A.    Yes.
8    Q.    Are you supposed to write in the
9    narrative section what you personally
10   observed? In the normal course of filling out
11   these forms, are you supposed to write in that
12   portion what you personally observed?
13   A.    That would be a no.
14   Q.    What are you supposed to write in
15   the narrative section with regard to what
16   allegedly occurred that led to the arrest?
17   A.    A violation arrest, so everything
18   I put down I have to personally observe.
19   Q.    Because -- just so I understand
20   it -- for a violation arrest, you have to
21   personally observe it?
22   A.    Observe it, yes.
23   Q.    Otherwise you can't make --
24   A.    You can't write it down. That's
25   why I didn't write down Captain Bologna gave

Page 136

1    T. Cai - Unproofread Transcript
2    the order to disperse. Right?
3    Q.    Okay. What you did write down,
4    however, again and we've been through this
5    earlier, you did write down that they marched
6    on the sidewalk, didn't you?
7    A.    Yes.
8    Q.    And you never saw them march
9    anywhere, correct?
10   A.    I saw them all moving around
11   within a radius of two, three feet, as I told
12   you before. Right?
13   Q.    Okay.
14   A.    And at that time, to my
15   knowledge, they were marching because there
16   were so many people on the sidewalk. So they
17   were like, you know, only 20 people on the
18   sidewalk, and they can march freely from one
19   location to another location.
20   Q.    Well, you saw them in the
21   roadway, not on the sidewalk, correct?
22   A.    Yes.
23   Q.    And you said the only movement
24   you say they made towards the east was when
25   they were walking backwards, correct?

Page 137

1    T. Cai - Unproofread Transcript
2    A.    Yes.
3    Q.    And you never saw them at any
4    point on the sidewalk ever, correct?
5    A.    Yes.
6    Q.    I'll phrase that in the
7    affirmative, so the record is clear. Did you
8    ever see them on the sidewalk ever?
9    A.    Not to my knowledge, no.
10   Q.    So when you wrote here that they
11   marched on the sidewalk, that can't be from
12   your personal observation, can it?
13   A.    No.
14   Q.    So this form should not have been
15   filled out like this, correct?
16          MR. WEILER: Objection.
17          You can answer.
18   A.    That's the story that they told
19   us to write, the legal bureau.
20   Q.    You filled this form out in this
21   way because the legal bureau told you to write
22   that there, correct?
23   A.    That's what I told them what
24   happened, what I saw. They were like this is
25   the form that you're going to be writing.

35 (Pages 134 to 137)

Page 138

1    T. Cai - Unproofread Transcript
2        Q.    And you told them what you saw --
3    withdrawn.
4            And what you told them that you
5    saw is what you have told me here today that
6    you saw, correct?
7        A.    Not to the details the questions
8    you've been asking. They just asked me a
9    general -- several general questions.
10       Q.    What were the several general
11   questions?
12           MR. WEILER: Objection. I'm not
13       going to allow the witness to answer
14       that.
15       A.    I don't recall anyway.
16       Q.    Did you tell them that you saw
17   these five arrestees standing in the roadway
18   on 35th Street?
19       A.    Do I recall -- what was the
20   question?
21       Q.    Did you tell the legal bureau
22   that you saw your five arrestees standing in
23   the roadway on 35th Street?
24       A.    I don't recall.
25       Q.    But you did not tell the legal

Page 139

1    T. Cai - Unproofread Transcript
2    bureau that you ever saw them on the sidewalk,
3    correct?
4        A.    I don't recall.
5        Q.    You never saw them on the
6    sidewalk, correct?
7        A.    Yes.
8        Q.    So would you have told the legal
9    bureau a lie?
10       A.    No.
11       Q.    So is it fair to say that you did
12   not tell the legal bureau that you ever saw
13   them marching on the sidewalk?
14       A.    I don't recall what I did tell
15   the legal bureau or I didn't tell the legal
16   bureau. I don't recall.
17       Q.    You just remember you told them
18   generally?
19       A.    The story what happened. They
20   say here's the narrative that you're going to
21   put down.
22       Q.    In box number 5 here it says
23   officer assigned, and you've written no. Now,
24   you said that Sergeant Crimmins told you to go
25   and make these arrests, correct?

Page 140

1    T. Cai - Unproofread Transcript
2        A.    Yes.
3        Q.    And he was there with you on the
4    corner of 35th and Sixth when he told you to
5    go make these arrests, correct?
6        A.    Yes.
7        Q.    And you only made these arrests
8    because sergeant Crimmins told you to?
9        A.    Yes.
10       Q.    So you were the assigned officer,
11   correct?
12       A.    No. Assigned officer means when
13   an officer didn't personally observe the
14   crime. The arrest was assigned to him by the
15   supervisor because the other members of /SEFRS
16   had arrested that person.
17       Q.    Okay.
18       A.    See if I arrest, you know what
19   I'm talking about, right?
20       Q.    I do. So the record is clear, on
21   what we've marked as Cai Exhibit 2, write the
22   word here, please, at the location where you
23   placed Ms. Aikman and the other five arrestees
24   into your custody where you handcuffed them,
25   please.

Page 141

1    T. Cai - Unproofread Transcript
2        A.    In this general, this area.
3        Q.    Write the word here.
4            (Witness complies.)
5        Q.    And you're pointing that arrow
6    towards the street, roadway, correct?
7        A.    This general area. I don't
8    recall which exact location.
9        Q.    I understand?
10       A.    There were five of them there.
11       Q.    You say they were arrested in the
12   roadway, correct?
13       A.    Yes.
14       Q.    So when you wrote here and are
15   pointing the arrow at that swirl of lines that
16   you just put there, that swirl of lines is in
17   the roadway on the western side of
18   35th Street --
19       A.    Yes.
20       Q.    -- correct?
21       A.    Yes.
22       Q.    Right by the crosswalk at Sixth
23   Avenue, correct?
24       A.    Yes.
25       Q.    In section 19 of this form, sir,

36 (Pages 138 to 141)

(212)279-5108

# EXHIBIT
# D

**Dinler/Schiller -- Revised January 31, 2007**[1]

Below is a list of individuals Defendants may rely on at trial to offer testimony relevant to their defense against Plaintiffs' claims. In addition, Defendants reserve their right to call any additional witnesses it deems necessary to rebut any testimony given by Plaintiffs or their witnesses regarding any claims arising from their arrest and detention during the Republican National Convention ("RNC"). We also reserve the right to call any witnesses needed for authentication or admissibility of exhibits.

A. Individuals with Knowledge of the Planning, Preparation, Policing and Arrest Processing for the RNC

- Chief of Department Joseph Esposito – Chief Esposito was the Chief of Department at the time of the RNC and may testify about the planning and preparation for the RNC, including the adoption of particular policies and procedures. Chief Esposito was deposed for 4 days in these actions.
- Assistant Chief John Colgan – Chief Colgan was the acting C.O. of the Criminal Justice Bureau at the time of the RNC and may testify about the planning of, preparation for, and arrest processing during the RNC as well as the operations of the Post Arrest Staging Site ("PASS") at Pier 57 during the RNC. He may also testify regarding security issues and concerns related to disorder control and terrorism. Chief Colgan was deposed for 5 days in these actions.
- Retired Chief Patrick Devlin – Chief Devlin was the Commanding Officer of the Criminal Justice Bureau prior to his retirement and may testify about the planning and preparation for the RNC including the processing of arrestees. Chief Devlin was deposed for 5 days in these actions.
- Deputy Chief Terence Monahan – Chief Monahan was in charge of the mobile field force units during the RNC and may testify about the planning and preparation for the RNC including the formation, organization, and training of the mobile field forces, as well as the deployment of the mobile field forces during the RNC. Chief Monahan was deposed for 3 days in these actions.
- Deputy Chief Thomas Graham - Chief Graham was the Commanding Officer of the Disorder Control Unit at the time of the RNC and may testify about issues concerning disorder control. He may also testify about the planning and preparation for the RNC including the formation, organization, and training of the mobile field forces, as well as

---

[1] As discussed, while plaintiffs contention interrogatories withdraw the conditions of confinement as a liability claim, Chris Dunn stated to me that he still intends to have plaintiffs testify regarding their conditions of confinement to support their damages. To that end, defendants still may rely upon the "conditions" witnesses in our case in chief as part of our defense of the *Schiller* and *Dinler* cases. Since plaintiffs stated that they wanted defendants solely related to this catergory identified, they have been marked with the following "[defense witness for its case in chief regarding conditions of confinement]".

In addition, defendants are still waiting for plaintiffs' revised contention interrogatories with answers to subpart b of all questions as previously agreed. If those responses change the context of the answers currently set forth, defendants reserve their right to call witnesses which are followed with the designation: "[withdrawn based upon plaintiffs' responses to defendants' contention interrogatories]".

the deployment of the mobile field forces during the RNC.   Chief Graham was deposed for 4 days in these actions.

- Deputy Chief William Morris –Chief Morris may testify about the planning of, preparation for, and arrest processing during the RNC.
- Deputy Chief  Vincent Giordano –Chief Giordano may testify about the planning of, preparation for, and arrest processing during the RNC as well as the operations of the PASS at Pier 57 during the RNC.   **[defense witness for its case in chief regarding conditions of confinement]**
- Deputy Inspector John O'Connell – Inspector O'Connell may testify about the planning of,  preparation for, and arrest processing during the RNC.
- Retired Captain Thomas Armet – Captain Armet may testify about the planning of, preparation for, and arrest processing during the RNC.
- Captain Andrew Savino – Lieutenant Savino may testify about the planning of, preparation for, and arrest processing during the RNC. **[withdrawn based upon plaintiffs' responses to defendants' contention interrogatories]**
- Lieutenant Daniel McFarland -  Lieutenant McFarland may testify about the planning of, preparation for, and arrest processing during the RNC. **[withdrawn based upon plaintiffs' responses to defendants' contention interrogatories]**
- Lieutenant Christopher Czark –Lieutenant Czark may testify about arrest processing and conditions at the Mass Arrest Processing Center ("MAPC") located at 125 White Street during the RNC. **[defense witness for its case in chief regarding conditions of confinement]**
- Assistant Deputy Commissioner Thomas Doepfner – Commissioner Doepfner may testify about NYPD Legal Bureau's role at the PASS at Pier 57 during the RNC, the permit process and issuance of permits for the RNC.
 - Special Counsel Ruby Marin-Jordan – Special Counsel Jordan may testify about NYPD Legal Bureau's role at the PASS at Pier 57 during the RNC.
 - Deputy Inspector Kerry Sweet – Deputy Inspector Sweet may testify about training provided for the RNC.
- Assistant Chief Jack McManus – Chief McManus was the Coordinator of the RNC and may testify about the planning of, preparation for, and providing of police services during the RNC.
- Deputy Inspector Matthew Pontillo – Inspector Pontillo assisted Chief McManus and may testify about the planning of, preparation for, and providing of police services during the RNC. **[withdrawn based upon plaintiffs' responses to defendants' contention interrogatories]**
- Director of Central Records Division James Simon – Mr. Simon was the Director of the NYPD Central Records Division at the time of the RNC and may testify about fingerprint processing including fingerprints taken during the RNC.  Mr. Simon was deposed in these actions.
- Deputy Commissioner of Intelligence David Cohen – Commissioner Cohen was the Deputy Commissioner of Intelligence during the RNC and may testify about the need for and development of intelligence information in connection with security issues during the RNC.
- Deputy Commissioner of Administration Charles DiRienzo – Commissioner DiRienzo was the Deputy Commissioner of Administration at the time of the RNC and may testify

about the planning and preparation of the PASS at Pier 57. **[defense witness for its case in chief regarding conditions of confinement]**

- Deputy Inspector Thomas Pellegrino – Inspector Pellegrino assisted Deputy Commissioner DiRienzo and may testify about the planning and preparation of the PASS at Pier 57. **[defense witness for its case in chief regarding conditions of confinement]**
- Deputy Inspector Michael Yanosik – Captain Yanosik was with the NYPD Building Maintenance Division at the time of the RNC and may testify about the planning and preparation for use of Pier 57 as a PASS. **[defense witness for its case in chief regarding conditions of confinement]**
- Amir Rasheed, Director, Occupational Safety And Health Section – Mr. Rasheed may testify about the conditions of Pier 57. **[defense witness for its case in chief regarding conditions of confinement]**
- Shakeel Ansari, Industrial Hygienist, Occupational Safety And Health Section – Mr. Ansari may testify about the conditions of Pier 57. **[defense witness for its case in chief regarding conditions of confinement]**
- Hudson River Park Trust – A representative from the Hudson River Park Trust may testify about the use and conditions of Pier 57. **[defense witness for its case in chief regarding conditions of confinement]**
- Ove Arup & Partners – A representative from Ove Arup & Partners may testify about the conditions of Pier 57. **[defense witness for its case in chief regarding conditions of confinement]**
- AKRF Inc. – A representative from AKRF, Inc. may testify about the conditions of Pier 57. **[defense witness for its case in chief regarding conditions of confinement]**
- Airtek Environmental Corp. – A representative from Airtek may testify about the conditions of Pier 57. **[defense witness for its case in chief regarding conditions of confinement]**
- TRC Environmental Corp. – A representative from TRC may testify about the conditions of Pier 57. **[defense witness for its case in chief regarding conditions of confinement]**
- Jorge Ocasio – Deputy Warden Ocasio may testify about the Department of Correction's planning and preparation for and custody of arrestees during the RNC. **[defense witness for its case in chief regarding conditions of confinement]**
- Criminal Justice Coordinator's Office – A representative from the CJC Office may testify about the arrest to arraignment process during the RNC. **[withdrawn based upon plaintiffs' responses to defendants' contention interrogatories]**
- Office of Court Administration – A representative from the OCA may testify about the arrest to arraignment process during the RNC. **[withdrawn based upon plaintiffs' responses to defendants' contention interrogatories]**
- Civilian Complaint Review Board – A representative from the CCRB may testify about the number of RNC-related complaints they received as well as their subsequent investigations and findings.
- New York State Commission of Correction – A representative from the State Commission of Correction may testify about conditions at 125 White Street and 100 Centre Street. **[defense witness for its case in chief regarding conditions of confinement]**.

B. Individuals with Knowledge of the Events at Union Square/16th Street on August 31, 2004

- Inspector James Essig
- Inspector Gerald Dieckmann
- Deputy Chief Thomas Galati
- Captain Anthony Johnson
- Lieutenant Patrick Cortright
- Lieutenant John Pribetich
- Deputy Chief Terence Monahan
- Captain Alex Laera
- Lt. Daniel Hayes
- Sgt. Hugh Byrne
- Sgt. Steven Dean
- Sgt. Evan Minogue
- Sgt. Michael Sold
- P.O. Frank Angelone
- P.O. Pasquale Bernardo
- P.O. Steven BenJacob
- P.O. Dominick Bizzaro
- P.O. Jason Carpentieri
- P.O. Paul Castel
- P.O. Henry Celestino
- P.O. Eunpa Chun
- P.O. Geirge Christiansen
- P.O. Steven Daniels
- P.O. Salvatore DiMaggio
- P.O. Lucille Fredericks
- P.O. John Gagliardi
- P.O. Micheal Hayes
- P.O. Daniel Jasinski
- P.O. Edward Julich
- P.O. Francis Knowles
- P.O. Joseph Lamendola
- P.O. Kenneth Larson
- P.O. Matthew Loftus
- P.O. Jeremiah Malone
- P.O. Robert Martin
- P.O. Matthew Murray
- P.O. Gerard Neumann
- P.O. Daniel O'Rourke
- P.O. Marc Pavlica
- P.O. Kenneth Prisco

- P.O. Gennaro Prudenete
- P.O. Emanuel Pryos
- P.O. Kenneth Singleton
- P.O. Juan Fernandez
- P.O. Kathleen Long
- P.O. John McCoade
- P.O. Prince Williams
- Lt. Mark Keegan
- Sgt. Jorge Encarnacion
- P.O. Abdiel Anderson
- P.O. Charles Chaplar
- P.O. Darren Rock
- P.O. Steven Ricca
- P.O. Alexis Fernandez
- Captain Paul DeEntremont
- Lt. Dave Sieve
- P.O. Brian Flemming
- Sgt. Allison Keating
- Detective Martinez
- Sgt. Conor McCourt
- Detective Kevin Dineen
- Detective Anthony Rupolo
- Detective Kenneth Marini
- Detective Michael Gordon
- Assistant Deputy Commissioner Thomas Doepfner

     C.  Individuals with Knowledge of the Events at Church/Fulton Streets on August 31, 2004

- Deputy Chief Terence Monahan
- Deputy Chief Thomas Galati
- Inspector James Shea
- Deputy Inspector James Shea
- Capt. Paul De Entremont
- Capt. Dermot Shea
- Lt. David Siev
- Lt. Brian Jackson
- Lt. James Griffin
- Lt. James O'Sullivan
- Sgt. Sean O'Connor
- Sgt. Frederic Grover
- Sgt. Geraldine Falcon
- Det. Anthony Dellavalle

- P.O.  Anthony Kempinski
- P.O.  Marc Manara
- P.O.  Santo Ippolito
- P.O.  William Haut
- P.O.  Michael Safoschnik
- P.O.  Steven Toth
- P.O.  Brian Rickli
- P.O.  Michael Boyle
- Ed Hedemann
- War Resistor's League
- Assistant Commissioner Robert Messner